**Philip C. WILD, Jr., Plaintiff-Appellant,**

v.

**LYKES BROTHERS STEAMSHIP CORPORATION, Defendant-Appellee.**

**No. 83–3359.**

United States Court of Appeals, Fifth Circuit.

June 25, 1984.

Barker, Boudreaux, Lamy, Gardner & Foley, Harold J. Lamy, Dymond, Crull & Castaing, William L. Crull, III, New Orleans, La., for plaintiff-appellant.

Terriberry, Carroll, Yancey & Farrell, John A. Bolles, New Orleans, La., for defendant-appellee.

Before CLARK, Chief Judge, RUBIN, and POLITZ, Circuit Judges.

CLARK, Chief Judge:

Philip C. Wild, Jr., appeals the judgment of the district court in favor of Lykes Brothers Steamship Corporation on his negligence claim brought under the Longshoremen's and Harbor Workers' Compensation Act (LHWCA). Wild contends that the district court's findings are clearly erroneous. We affirm the district court's decision, because Wild failed to prove the prerequisites for establishing liability under the LHWCA laid down by the Supreme Court.

I

In May 1977, Dixie Welding and Metal Works, Inc., a stevedoring company, began performing extensive repairs on the DOCTOR LYKES, an oceangoing vessel owned by Lykes. Wild performed general repair work for Dixie Welding while on board the DOCTOR LYKES. The repair contract required several longshoremen, including Wild, to work on an elevator deck. Cargo barges rest on the elevator deck, which is then raised to a position level with the main deck to allow the barges to be transferred to the main deck. In its stowed position the elevator deck is five to six feet below the main deck. To move from the main deck to the stowed elevator deck, Wild and other longshoremen used an appurtenance of the vessel that could be positioned either as a guardrail or as a ladder. This device, which is bolted to the ship, was used primarily as a guardrail around three sides of a small observation platform on the main deck. It could be converted into a ladder, its secondary use, by unfastening the bottoms of its two inboard vertical stanchions from their main deck attachments and then rotating the appurtenance approximately 145 degrees outboard about the pinfixed bases of its two outboard vertical stan-

chions. When thus unbolted and rotated, the guardrail's inboard vertical stanchions became a handrail, and its horizontal sections became the steps of a ladder leading from the main deck down to the elevator deck. The appurtenance also had two arms with cross bars that hung from the top of the outboard vertical stanchions when in the guardrail mode. When the appurtenance was converted to use as a ladder these arms and bars folded out to add two more steps. The handrails did not extend alongside these two additional steps.

On the day Wild began working, his foreman took him down this device, which was then in the ladder position. Wild used the ladder several times a day while working in the area of the elevator deck. Although Wild considered the ladder unsafe, he continued to use it and never told his foreman he thought it was unsafe.

Wild was injured when he slipped on the ladder. The district court found that grease on Wild's shoes and on the steps partially caused him to slip and that movement of the ladder and the absence of a handrail for the lower end of the ladder also contributed to his fall.

Wild sued Lykes under the LHWCA, 33 U.S.C. § 905(b). He alleged that Lykes was negligent since it maintained a defective ladder on its vessel for use by longshoremen. After a bench trial, the district court ruled in favor of Lykes. The district court found that although the device, when used as a ladder, was defective and unreasonably dangerous, Wild failed to prove that Lykes had affirmatively acted to furnish the ladder for use by Dixie's workers. In addition, the district court held that Wild failed to prove that Lykes had actual knowledge that Dixie's employees were using the device as a ladder. Wild introduced no evidence to prove that Lykes placed the device in the ladder position before turning the ship over to Dixie Welding for repair.

■ These findings are reviewed on appeal under the clearly erroneous rule. Fed. R.Civ.P. 52(a); see *Hill v. Texaco, Inc.,* 674 F.2d 447, 450 (5th Cir.1982). A finding is clearly erroneous when "although there is

evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

## II

Our analysis begins with *Scindia Steam Nav. Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). In *Scindia*, the Supreme Court extensively analyzed the 1972 amendments to the LHWCA[1] and outlined the duty owed to longshoremen by the owner of a vessel on which they work. "As a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards. The ship is not the common employer of the longshoremen and owes no such statutory duty to them." *Id.* at 170, 101 S.Ct. at 1623–24 (footnote omitted). We have stated that "the primary responsibility for the safety of the longshoremen rests upon the stevedore." *Helaire v. Mobile Oil Co.*, 709 F.2d 1031, 1036 (5th Cir.1983).

 *Scindia* teaches that the vessel owner no longer has a duty to inspect or supervise the stevedore once its work has begun. "[A]bsent contract provision, positive law, or custom to the contrary ... the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." 451 U.S. at 172, 101 S.Ct. at 1624. The *Scindia* Court also described the circumstances in which reliance by the vessel owner on the stevedore would not absolve the owner of liability. We summarized the *Scindia* holding in *Helaire:*

First, before turning over the ship to the stevedore, the owner has a duty to warn

the longshoremen of hidden defects that would be known to the shipowner in the exercise of reasonable care. He must also exercise care to deliver to the stevedore a safe ship with respect to gear, equipment, tools, and work space. Second, the owner has a duty to avoid exposing the longshoremen to harm "from hazards under the act or control of the vessel." Third, even though the owner is generally relieved of responsibility for accidents which occur once the unloading process has begun, "if [the stevedore's] judgment ... was so obviously improvident that [the owner], if it knew of the defect and that [the stevedore] was continuing to use it, should have realized the [defect] presented an unreasonable risk of harm to the longshoremen, ... in such circumstances [the owner] had a duty to intervene," and eliminate or neutralize the hazard.

709 F.2d at 1036.

 As in *Helaire* and *Scindia*, we deal here with an injury that occurred after stevedoring operations had begun and as a result of an open and obvious danger.[2] Thus, our inquiry focuses on the standard set forth in *Helaire* for determining a vessel owner's liability:

Once loading operations have begun, the vessel owner can be held liable for injuries to employees of the stevedore resulting from open and obvious dangers only in the event of actual knowledge of the danger *and* actual knowledge that he cannot rely on the stevedore to remedy the situation.

*Id.* at 1038–39 (footnote omitted). Wild, therefore, may recover only if he proved that Lykes had actual knowledge of the guardrail/ladder's dangerous condition and actual knowledge that Dixie Welding was

---

**1.** The 1972 amendments "radically changed" the scheme under which longshoremen could recover for injuries sustained while working on a ship. *Scindia*, 451 U.S. at 165, 101 S.Ct. at 1621. The changes resulting from those amendments are studied elsewhere. For example, see *Helaire v. Mobile Oil Co.*, 709 F.2d 1031, 1034–36 (5th

Cir.1983) and G. Gilmore & C. Black, *The Law of Admiralty* §§ 6–46 to 6–57 (2d ed. 1975).

**2.** At oral argument, Wild's counsel conceded that the device was an open and obvious danger when used as a ladder.

not acting to protect its employees from the dangerous condition.

■ The district court found that the device, when used as a ladder, was defective and unreasonably dangerous because its steps were round and made of steel, it was unsteady, and it lacked a handrail for the last two steps. This finding tends to establish Lykes's actual knowledge that the device when used as a ladder was dangerous. But Wild must have proved more. He did not. The district court found that Wild failed to show that Lykes actually knew that Dixie Welding's employees were using the device as a ladder. Thus, Lykes could not have known of the dangerous condition or that Dixie Welding was not acting to protect its employees from the dangerous condition.

Although Lykes conceded that the repair contract with Dixie Welding required that work be performed on the elevator deck and that the guardrail/ladder was the only means the vessel could provide for access to the elevator deck from the main deck, these concessions do not substitute for proof that Lykes actually knew Dixie Welding was using the device as a ladder and was not acting to protect the longshoremen. We said in *Helaire* that "actual, not constructive, knowledge is mandated by the Supreme Court's *Scindia* requisites for liability under § 905(b)." 709 F.2d at 1039–40. *Helaire* also pointed out that a vessel owner's "actual knowledge of a dangerous condition which later injured a longshoreman would not in and of itself make him negligent." *Id.* at 1039 n. 12. In this situation, the vessel owner could reasonably "rely on the stevedore's judgment that the condition, though dangerous, was safe enough. *Id.* (citing *Scindia*, 451 U.S. at 175–76, 101 S.Ct. at 1626). We hold that the finding of the district court that Wild failed to prove Lykes actually knew the ladder was being used was not clearly erroneous.

The evidence is undisputed that Dixie Welding had a gangway readily available that could have been used in place of the ladder. They had used gangways before in similar situations and did so here after Wild's injury. Wild's foreman testified that had Wild told him of the hazard created by the ladder, he would have acted to protect the safety of Wild and the other longshoremen.[3]

Wild argues that *Pluyer v. Mitsui O.S.K. Lines, Ltd.*, 664 F.2d 1243 (5th Cir. 1982), compels reversal here. The district court's holding that *Pluyer* does not control this case was correct. In *Pluyer*, the longshoreman was injured while climbing down an unsafe ladder that had been furnished to him by a member of the vessel's crew. *Id.* at 1244–45. *Pluyer* is distinguishable on two grounds. First, that case dealt with the liability of a ship's owner before stevedoring operations had begun. Second, the negligence by the ship there was active. In *Pluyer* we noted the effect of these two factors: "The policy considerations which militate against imposing a duty on the ship owner to constantly monitor the stevedore's work are therefore not applicable." *Id.* at 1246 (footnote omitted).

Those policy considerations held inapplicable in *Pluyer* apply with full force to today's case. *Scindia* and *Helaire* clearly state the prerequisites for liability under § 905(b): Actual knowledge by the owner that a dangerous condition does exist and actual knowledge that the stevedore is not acting to protect the longshoreman. Wild failed to prove either of these prerequisites and, therefore, is precluded from recovery.

**AFFIRMED.**

POLITZ, Circuit Judge, dissenting:

Being convinced that the majority opinion is not consistent with *Scindia Steam*

---

**3.** This undisputed evidence negates the conclusion that Wild's use of the guardrail/ladder was unavoidable and, thus, should allow recovery under prior case law that has permitted recovery for personal injuries by longshoremen encountering open and obvious dangers when the danger "must be faced notwithstanding knowledge." *Gay v. Ocean Transport & Trading, Ltd.*, 546 F.2d 1233, 1242 (5th Cir.1977); *see Pluyer v. Mitsui O.S.K. Lines, Ltd.*, 664 F.2d 1243, 1247 (5th Cir.1982).

*Nav. Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), and decisions of this court, I respectfully dissent.

Philip C. Wild, Jr. was a boilermaker employed by Dixie Machine and Metal Works, Inc. as part of a crew engaged in repairing the Lykes' vessel DOCTOR LYKES. Wild was injured when he slipped or fell from a convertible guardrail/ladder which served to bridge the gap between the upper deck of the vessel and the ship's elevator when the elevator was in the stowed position. When stowed the elevator was five to six feet below the upper deck. The majority opinion carefully details the method by which this ship's appurtenance was converted from a guardrail around a platform adjacent to the elevator to a ladder permitting access to the lowered elevator. The record establishes beyond question that the guardrail/ladder was bolted into place as a part of the vessel, that it was regularly and routinely used by the ship's crew and repairmen as a ladder to climb to or from the stowed elevator, that it was the only ladder available for that purpose at the time of Wild's accident, that the elevator was in a lowered position when the Dixie repair crew began repair work and that the ship's crew lowered the elevator. In addition, the record fully supports the trial judge's finding that the guardrail/ladder was defective and unreasonably dangerous as a ladder. And, as the majority notes, the record also "tends to establish Lykes' actual knowledge that the device when used as a ladder was dangerous." Therefore, when Lykes delivered the ship over to Dixie, it delivered a ship with actual knowledge that the guardrail/ladder, when used as a ladder, was dangerously defective.

In my opinion, *Scindia* and its progeny do not excuse the vessel owner from liability in the factual situation presented. As we noted in *Pluyer v. Mitsui O.S.K. Lines, Ltd.,* 664 F.2d 1243, 1246 (5th Cir.1982), *Scindia* was "concerned only with the liability of the vessel for dangerous conditions which develop during stevedoring operations." In the present case, as in *Pluy-*

er, we are concerned with the vessel's liability for "hazards that antedate or are coincident with the commencement of cargo operations." *Id.* In the evaluation of a vessel's liability for hazards which antedate the commencement of repair work, the duties of the vessel owner are clear:

> This duty extends at least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work. The shipowner thus has a duty with respect to the condition of the ship's gear, equipment, tools and work space to be used in the stevedoring operations; and if he fails at least to warn the stevedore of hidden danger which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to a longshoreman.

*Scindia,* at 101 S.Ct. 1622 (citations omitted).

The unreasonably dangerous condition found by the trial court was directly attributable to Lykes who delivered a vessel with a built-in convertible guardrail/ladder which was defective and hazardous when used as a ladder. The vessel owner is held to know the dangerous conditions resulting from defects in the vessel, its gear or equipment. For several days, while "the captain, chief engineer, first assistance engineer, [and] possibly second assistant engineer" were aboard, various repairmen used the ladder. No other means of traversing to and from the elevator was fur-

nished by the vessel or by Wild's employer. Wild used what was there to be used.

I part with the majority when it requires that Wild prove not only that the vessel owner knew of the hazard but that it also knew that it could not rely on Dixie to remedy that hazard. This proof requirement is appropriate for hazards which arise during repairs but is not appropriate for hazards which exist before repairs begin. Despite a suggestion by the majority, it cannot be gainsaid that the defective condition was in existence when the DOCTOR LYKES was delivered over to Dixie. Notwithstanding its knowledge that the guardrail/ladder was unreasonably dangerous when used as a ladder, and that it was regularly and routinely used as a ladder when the elevator was lowered, Lykes issued no warning to Dixie.

Under these circumstances, I am persuaded that the vessel owner breached a duty to Wild recognized in *Scindia* and not foreclosed by its teachings. I disagree with the majority that *Pluyer* is inapposite; I consider it directly in point. *Pluyer*, like the instant case, involved a defective condition which existed when the vessel was turned over to the stevedore. *Pluyer*, like the instant case, involved a defective ladder, albeit a portable one, furnished by the vessel. In both cases the defective ladder caused the injury. The vessel owner was held accountable in *Pluyer*. The vessel owner in the case at bar should likewise be held accountable.

I respectfully dissent.