Jack GIACONA

v.

MARUBENI OCEANO (PANAMA) CORP., Agri Industries.

Civ. A. No. H–83–725.

United States District Court,
D. Texas,
Houston Division.

Dec. 27, 1985.

Joseph D. Jamail, III, Jamail, Kolius & Mithoff, Houston, Tex., for plaintiff.

Steven L. Roberts, Fulbright & Jaworski, Houston, Tex., for intervenor Home Ins. Co.

James Blaine and E.D. Vickery, Royston, Rayzor, Vickery & Williams, Houston, Tex., for defendant Marubeni Oceano (Panama) Corp.

Steve Bryant, Houston, Tex., for defendant Agri Industries.

## MEMORANDUM AND ORDER

CARL O. BUE, Jr., District Judge.

Before the Court is defendant Marubeni Oceano (Panama) Corp.'s (hereinafter "Marubeni") Motion for Judgment as to the plaintiff's claim as well as its Motion for Judgment on the cross claim asserted by defendant Agri for indemnity pursuant to its tariff. Plaintiff Jack Giacona filed suit pursuant to 33 U.S.C. § 905(b) of the Longshoremen's & Harbor Workers' Compensation Act (hereinafter "LHWCA"), invoking this Court's maritime jurisdiction. At the conclusion of plaintiff's case on September 19, 1985, which was presented to the Court without a jury, Marubeni moved for judgment on both issues. For the reasons stated hereinafter, this Court concludes that both of defendant's motions must be granted.

### I. *Factual Background*

Plaintiff, Jack Giacona, a longshoreman, brought this action against Marubeni, the owner of the M/V *Atlantic Pioneer*, and Agri Industries, Inc. (hereinafter "Agri"), owner of a grain elevator and terminal. Plaintiff sustained personal injuries on July 15, 1982, while employed as a longshoreman by Shippers Stevedores, Inc. The vessel was docked at Agri's terminal to load grain; plaintiff was on board the vessel on navigable waters in the Port of Houston when he slipped and fell while attempting to descend a gangplank.

Plaintiff filed suit pursuant to 33 U.S.C. § 905(b) contending that defendants were jointly and severally negligent in the provision or maintenance of a defective gangway, or in failing to eliminate a dangerous condition on the gangplank caused by the excessive accumulation of grain dust.

### II. *Legal Background*

The LHWCA allocates the costs of accidents through the enactment of a compromise between the rights of employers and employees which is typical of worker's compensation schemes: an injured worker is entitled to receive "prompt and certain" compensation benefits from his employer even if the employer is not to blame for the accident. *See Peters v. Speeflo Manu. Corp.,* 764 F.2d 306, 310 (5th Cir.1985). The employers' *quid pro quo* for the imposition of strict liability is that employees frequently are entitled to recover less than could be recovered under traditional tort compensation systems. Furthermore, recovery under the Act constitutes the employers' exclusive liability for employees' injuries. Since injured longshoremen are often limited to a reduced recovery against their employers, section 33(a) of the LHWCA, 33 U.S.C. § 933(a), preserves the compensated workers' right to recover traditional tort damages from parties other than employers, that is, third parties who are neither properly benefited nor limited by the "trade-offs" implemented by the Act.

This brief overview of the LHWCA's compensation scheme places in context the rights and liabilities of the parties before the Court. Cases brought pursuant to the Act often involve workers who are longshoremen, employers who are stevedores, and third party vessel owners. In these circumstances, the LHWCA addresses the substantive rights of longshoremen against third party vessel owners, such as Marubeni, and limits them to a negligence cause of action against the vessel.

The longshoremen's substantive rights of recovery against third parties are, of course, generally determined by law independent of the LHWCA. Plaintiff's right to recover against Agri in this case is governed by the principles of negligence established by Texas tort law.

To this point, the law governing the respective rights and liabilities of the parties is well established. Consequently, the most problematic issue before this Court concerns the enforceability of a tariff issued by Agri which purports to exculpate Agri from liability for damages such as those sustained by plaintiff, even if proximately caused by Agri's own negligence. If plaintiff can prove that Agri was negligent in the provision or maintenance of the gangplank at issue, the effect of the indemnity provisions would be to shift liability

from Agri to Marubeni and by direct contract provision establish a remedy reminiscent of the entire jerry-built *Sieracki-Ryan* structure with its attendant circuitous litigation.[1]

### III. *The Vessel Owner's Duty to Longshoremen*

In limiting longshoremen to a negligence cause of action against the vessel owner, the LHWCA abrogated the judicially created warranty of seaworthiness owed by vessel owners to longshoremen and, in exchange, the indemnity owed by stevedores to vessels for breach of the warranty of workmanlike performance.[2]  Thus, plaintiff's right to recover against Marubeni is governed by the Supreme Court's decision in *Scindia Steam Navigation Co., Ltd. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981) (hereinafter cited as *"Scindia"*) and its progeny, which delimit the duty owed by shipowners to longshoremen under relevant negligence standards.

### A. *The Rule of Scindia Bars Plaintiff's Claims Against the Vessel Owner*

In *Scindia, supra* at 170–72, 101 S.Ct. at 1623–25 the Supreme Court defined the scope of the vessel owner's duty to protect longshoremen from injury during stevedoring operations pursuant to 33 U.S.C. § 905(b).  After concluding that the shipowner is entitled to rely on the stevedore to avoid exposing longshoremen to unreasonable hazards, the Court stated as follows:

> The shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore.  The necessary consequence is that the shipowner is

not liable to the longshoremen for injuries caused by dangers unknown to the owner and about which he had no duty to inform himself ...  The shipowner within limits is entitled to rely on the stevedore, and owes no duty to the longshoremen to inspect or supervise the cargo operations.

*Scindia, supra,* at 172, 101 S.Ct. at 1624.

■ *Citing The Admiral Peoples,* 295 U.S. 649, 55 S.Ct. 885, 79 L.Ed. 1633 (1935), plaintiff maintains that the gangway as the ship's only means of access to land became a basic appurtenance of the vessel.  Since the gangway was defective *prior to* the onset of cargo operations, plaintiff further argues that the rule stated in *Scindia* has no application to the case at bar.

First, this Court notes that the line of authority developed subsequent to *Scindia,* and discussed hereinafter, demonstrates that the scope of the vessel owner's duty to longshoremen as outlined in *Scindia* is clearly relevant here.  Second, and more significantly, this Court notes that the interpretation of *Scindia* which plaintiff urges the Court to accept is plainly inconsistent with "congressional intent to foreclose the faultless liability of the shipowner based on the theory of unseaworthiness or nondelegable duty."  *Scindia, supra,* 451 U.S. at 172, 101 S.Ct. at 1624.

Plaintiff's reliance on *Pluyer v. Mitsui O.S.K. Lines, Ltd.,* 664 F.2d 1243 (5th Cir. 1982), and *Sarauw v. Oceanic Navigation Corp.,* 655 F.2d 526 (3d Cir.1981) is similarly misplaced.  Although both cases cited by plaintiff involved longshoremen who were provided with unsafe means of ingress and egress from ships, they are clearly distinguishable from the instant action.  Vessel owners in *Pluyer* and *Sarauw* were held

---

**1.** For an excellent discussion of the continuing vitality of the *Sieracki* and *Ryan* doctrines, *see* Caudle, *The Survival of Sieracki and Ryan,* 24 So.Tx.L.J. 587 (1984).  Even here, Marubeni seeks damages against Agri based upon the *Ryan* doctrine.

**2.** One of the underlying purposes of the 1972 Amendments of the LHWCA was to eliminate the longshoreman-vessel owner-stevedore trian-

gle which allowed the longshoreman to sue the vessel owner under the warranty of seaworthiness, and the vessel owner to sue the stevedore under the warranty of workmanlike performance, and thereby eliminate the litigation nightmare which was clogging the federal court system.  *See* S.Rep.No. 1125, 92d Cong., 2d Sess. at 9 (1972).

liable to longshoremen *only after* it was determined that the owners had failed to exercise reasonable care under the circumstances with respect to the provision or maintenance of the respective appurtenances.[3]

Contrary to the assertions made by plaintiff, there is absolutely no evidence in the record which supports the conclusion that Marubeni was negligent in the provision or maintenance of the gangplank at issue. The record is simply devoid of proof even suggesting that Marubeni knew, or should have known, that the gangway was defective prior to the commencement of cargo loading operations. In fact, it is uncontested that the gangway was provided solely by Agri and that it was at all relevant times under the exclusive control of either Agri or plaintiff's employer.

### B. *The Rule of Helaire Bars Plaintiff's Claims Against the Vessel Owner*

In analyzing the shipowner's duty to longshoremen subsequent to the Supreme Court's decision in *Scindia*, the Fifth Circuit Court of Appeals has set forth three circumstances under which a vessel owner's duty of care to longshoremen might arise pursuant to § 905(b). In *Helaire v. Mobil Oil Co.*, 709 F.2d 1031 (5th Cir.1983) (hereinafter cited as *Helaire*) the Fifth Circuit stated as follows:

> First, before turning over the ship to the stevedore, the owner has a duty to warn the longshoremen of hidden defects that would be known to the shipowner in the exercise of reasonable care. He must also exercise care to deliver to the stevedore a safe ship with respect to gear, equipment, tools and work space. Second, the owner has a duty to avoid exposing the longshoremen to harm "from hazards under the act or control of the vessel." Third, even though the owner is generally relieved of responsibilities for

accidents which occur once the unloading process has begun, "if [the stevedore's] judgment was so obviously improvident that [the owner], if it knew of the defect and that [the stevedore] was continuing to use it, should have realized the [defect] presented an unreasonable risk of harm to the longshoremen, ... in such circumstances [the owner] had a duty to intervene" and eliminate or neutralize the hazard.

*Helaire, supra* at 1036 (citations omitted).

In the case at bar, plaintiff's injuries occurred several hours after the M/V *Atlantic Pioneer* was turned over to Shippers Stevedores for loading. At the time of the accident, the stevedore had control of the work space in which plaintiff was injured; Marubeni was not involved in supervising the cargo handling operations. The Fifth Circuit in *Helaire* described the limited duty of the vessel owner once the vessel has been turned over to the stevedore and cargo operations have begun, as follows:

> Once loading operations have begun, the vessel owner can be held liable for injuries to employees of the stevedore resulting from open and obvious dangers only in the event of actual knowledge of the danger *and* actual knowledge that he cannot rely on the stevedore to remedy the situation. He is not held to a duty to discover the condition or to anticipate its danger.

*Helaire, supra* at 1038–39.

The Fifth Circuit's dual-pronged test stated in *Helaire* has been reiterated and confirmed in *Castorina v. Lykes Bros. S.S. Co., Inc.*, 758 F.2d 1025, 1033 (5th Cir. 1985); *Futo v. Lykes Bros. S.S. Co., Inc.*, 742 F.2d 209, 216 (5th Cir.1984), and *Wild v. Lykes Bros. Steamship Co., Inc.*, 734 F.2d 1124, 1126 (5th Cir.1984). Furthermore, the Fifth Circuit has explicitly stated that in accordance with the Supreme

---

**3.** The longshoreman in *Sarauw* was injured when the gangway, which was wholly unsecured to the vessel, gave way as he was attempting to board. There was evidence that the shipowner had posted a gangway watch and that the gangway watch knew or should have known that the gangway was not secured to the vessel.

*See* 622 F.2d 1168, 1171, 1173 (3d Cir.1980). In *Pluyer*, the vessel owner supplied the longshoreman with an unsafe ladder. The defective condition of the ladder was open and obvious, and the vessel owner turned over the ship to the stevedore in a defective condition. *See* 664 F.2d at 1247.

Court's opinion in *Scindia,* knowledge on the part of the owner required by the *Helaire* test must be actual knowledge and not merely constructive knowledge. *See Helaire, supra,* at 1038–39; *Futo, supra* at 218–20, and *Wild, supra* at 1127.

To the extent that there was an excessive accumulation of grain dust which constituted an unsafe condition on Agri's gangway, Marubeni is not liable to the plaintiff under the rule announced in *Helaire.* Since the condition arose, if at all, after the commencement of cargo operations, Marubeni would have a duty to remedy the situation only if it had actual knowledge that an unsafe condition had developed. *See Helaire, supra* at 1031. There is no evidence in the record to support the conclusion that Marubeni had actual knowledge that an unsafe condition had developed as a consequence of excessive grain dust accumulation.

Defendant directs this Court's attention to *Thompson v. Cargill, Inc.,* 585 F.Supp. 1332 (E.D.La.1984) and *Taylor v. Moram Agencies,* 739 F.2d 1384 (9th Cir.1984). In *Thompson,* the court noted that "grain dust settling on the deck of a vessel is a natural, normal occurrence during grain loading operations" and that the vessel owner was entitled to "rely on [the stevedore] to perform its ... job properly, including the cleaning of the deck as part of the job, and the slippery footing posed only a limited and acceptable hazard." *Id.* at 1334–35 (citing *Stass v. American Commercial Lines, Inc.,* 720 F.2d 879, 884 (5th Cir.1983), *reh'g en banc denied,* 724 F.2d 976 (1984)).

The bipart *Helaire* test applies to cases in which the plaintiff's claim arises in the context of vessel repairs, as well as to claims resulting from injuries sustained during routine longshoring operations. Thus, the rationale expressed in the recent "vessel repair" line of cases applies with equal force to the parties before this Court. For example, in *Wild, supra* at 1124, the Fifth Circuit affirmed judgment in favor of the vessel owner, holding that a repairman was not entitled to recover from the vessel owner when he failed to demonstrate that the owner had actual knowledge that a dangerous condition existed *and* actual knowledge that the repairman's employer was not taking precautions to protect the plaintiff. *Id.* at 1127. The repairman was injured while descending an appurtenance of the vessel that could be positioned either as a guard rail or as a ladder. *Id.* at 1125. Although the Court found that the device was defective and unreasonably dangerous when used as a ladder, the Court also found that the plaintiff had failed to prove that the shipowner had affirmatively acted to furnish the appurtenance for use as a ladder by the repairmen, and that the shipowner had actual knowledge that the repairmen were using the device as a ladder. *Id.* at 1127.

In *Stass, supra* at 879, and *Meserole v. M/V Fina Belgique,* 736 F.2d 147 (5th Cir. 1984), the Fifth Circuit affirmed judgments in favor of vessel owners. In both cases, plaintiff/repairmen had slipped and sustained injuries caused by substance accumulation aboard ship. The plaintiff in *Stass* slipped on sprouted soybeans scattered on the top of grain doors that his employer had been retained to repair; *Meserole's* complaint concerned an oily film on the deck of an engine room. The Court refused to impose liability on the vessel owners, concluding that the accumulated substances did not pose unreasonable hazards, but instead involved risks inherent in carrying out the independent contractors' employment. Similarly, in the instant action, slippery footing caused by settling grain dust may be properly considered a "risk inherent" in carrying out the stevedore's contract. *See Meserole, supra* at 148–49. Even if there had been an excessive accumulation of grain dust, Marubeni had no duty to warn longshoremen concerning an open and obvious condition known only to the longshoremen, or to inspect or supervise the operations carried out by the stevedore. To the contrary, the vessel owner is generally entitled to rely on the stevedore to avoid exposing its employees to unreasonable hazards. *See Stass, supra* at 884.

Accordingly, under the principles established by the Supreme Court in *Scindia*, and affirmed by the Fifth Circuit in *Helaire*, there is absolutely no basis for the imposition of liability upon Marubeni pursuant to 33 U.S.C. § 905(b). Thus, Marubeni is entitled to judgment against the plaintiff as a matter of law on the facts of this case. To hold otherwise would be to resurrect and impose anew upon the shipowner a species of liability without fault (unseaworthiness) which was specifically addressed and prohibited by the 1972 amendments to the LHWCA.

### IV. *The Vessel Owner's Liability Under The Indemnity Provisions*

Defendants Agri and Marubeni have filed cross actions against each other premised upon a vigorous debate concerning the enforceability of the indemnity provisions contained in Tariff No. 1, issued by Agri Export Cooperative, effective December 5, 1980, as revised on February 15, 1982, which governs the Rates, Charges and Regulations of Agri's grain elevator. Marubeni contends that the indemnity provisions are void as a matter of public policy; alternatively, Marubeni contends that the provisions are unenforceable because Marubeni was not a signatory of the berthing application which incorporates the tariff provisions by reference. Finally, Marubeni contends that the provisions are unenforceable as a matter of contract interpretation because they do not comport with the "clear and unequivocal test" set forth under both Texas common law and federal maritime law. For the reasons discussed hereinafter, this Court holds that Agri's indemnity provisions are unenforceable as a matter of law insofar as they purport to exculpate Agri from liability for its own negligence and that judgment on the cross claim asserted by defendant Agri for indemnity must be granted in favor of Marubeni.

### A. *Marubeni's Public Policy Agrument*

■ Before the Court for interpretation are Items 222 and 226[4] of Agri Export Cooperative's Tariff No. 1 governing Agri's Houston Elevator. Marubeni contends that the indemnity provisions contained therein are invalid as a matter of law under the authority of *Central National Corp. v. Nantucket Navigation, Inc. and T. Smith & Son (Texas), Inc. v. Port of Houston Authority* (F.M.C. Docket No. 82–23, April 30, 1984), and *West Gulf Maritime Ass'n v. City of Galveston*, 22 F.M.C. 101 (1979). These cases stand for the proposition that exculpatory clauses in tariffs, which purport to relieve a port of liability for damage or injury to cargo caused by the port's own negligence, constitute an unjust and unreasonable regulation which violates Section 17 of the Shipping Act, 1916. 46 U.S.C. § 816. While Marubeni argues that these federal maritime cases control in the instant action, for the reasons stated hereinafter, this Court cannot agree.

---

**4.** The relevant tariff provisions provide as follows:

Item 222 All users of the elevator shall indemnify and save harmless the AGRI Export Cooperative from and against any and all claims, actions, damages, liability or expense, including court costs and attorney's fees in connection with loss of life, bodily injury and damage to property, incident to or resulting from their operation at the elevator or use of the elevator facilities.

Item 226 1. User assumes sole responsibility and liability for injury to or death of any person whomsoever, or damage to or destruction of property of user or any other such person incident to, arising out of or in connection with user's entering upon the premises of the elevator operator, and custody, possession, use or operation of the elevator operator's equipment, or failure of such equipment to operate; and user shall protect, indemnify and save harmless the elevator operator from and against any and all liability for or in respect of the same.

2. All equipment of the elevator operator utilized by user in performing its work shall be presumed to be in good operating condition when turned over to user or when made use of by the user; but the elevator operator makes no warranty with respect to the mechanical condition of said equipment.

3. By receiving possession thereof or utilizing said equipment, user agrees that upon termination of the period of use said equipment shall be returned to the elevator operator in the same condition as when received, ordinary wear and tear alone excepted.

First, this Court recognizes the distinction which exists between public and private ports. As Agri points out in its memorandum of law, the cases relied on by Marubeni concern exculpatory clauses in tariffs of *public* ports. The Commission's intent that indemnity provisions are invalid only in public port tariffs is evidenced by the underlying rationale expressed in *S. Charles Lucidi v. The Stockton Port District*, 22 F.M.C. 19 (1979). In that case, the Commission stated as follows:

> The provisions of Item 85 (the tariff indemnity provisions at issue in *Lucidi*) are against public policy insofar as such policy required businesses affected with public interest be precluded from taking unfair advantage of those who by necessity must use the facilities of such business.

*Id.* at 27. Public terminal operators were again singled out in *United States Lines, Inc. v. Maryland Port Administration*, F.M.C. Docket Nos. 78–15, 78–17, 78–18 and 78–19 (December 16, 1980), where the Commission stated, "[a] public operator ... is clearly in a position such that exculpatory clauses in its tariff create an unreasonable hardship upon those who would be consequently liable for the port's own negligence."

In developing this rationale, Agri argues that the Commission relied heavily on the Supreme Court's holding in *Bisso v. Inland Waterways Corp.*, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), which considered the question of whether a towboat could validly contract against all liability for its own negligent towage. Through analogies drawn from the public utility context, the Supreme Court held that such contracts were void as against public policy, and upheld the long-established rule that a common carrier cannot stipulate for immunity from its own negligence. *See United States v. Atlantic Mut. Ins. Co.*, 343 U.S.

236, 72 S.Ct. 666, 96 L.Ed. 907 (1951); *Boston Maine R. Co. v. Piper*, 246 U.S. 439, 38 S.Ct. 354, 62 L.Ed. 820 (1918). The Court recognized the need to protect those in need of goods or services from being overreached by others who have the power to drive hard bargains. *See, e.g., Bisso, supra* at 91, 75 S.Ct. at 632. In contrast, Agri is a private port which was not in a superior bargaining position when dealing with Marubeni.

Second, although Agri has filed its tariff with the Federal Maritime Commission, Agri is not required to seek formal approval from the Commission under section 15 of the Shipping Act, 1916, 46 U.S.C. § 814. The types of agreements that must be approved by the Commission are set forth in the statute which, at all times relevant here, provided as follows: "Every common carrier by water, or other person subject to this chapter, shall file immediately with the Commission ... every agreement, with another such carrier or other person subject to this chapter ..."

Agri is neither a "common carrier by water" nor other person subject to section 15 of the Shipping Act. The term "other person subject to this chapter" is defined as any person not included in the term "common carrier by water" who carries on the business of forwarding or furnishing wharf, dock, warehouse or other terminal facilities in connection with a common carrier by water. 46 U.S.C. § 801. In fact, Agri's tariff specifically states in Item 200[5] that Agri will not handle or service vessels defined as "common carriers by water" within the meaning of the Shipping Act.

Unlike the position urged by Marubeni, this Court concludes that where there is neither industry affected with the public interest nor an unequal bargaining position between the parties, public policy actually dictates the upholding of freedom of con-

---

**5.** The relevant tariff provision provides as follows:

> Item 200 Until further notice, the elevator will not handle or service liner vessels, that is, vessels defined as common carriers by water by the Shipping Act of 1916. Loading of vessels other than ocean-going bulk carriers will be undertaken only by special arrangement. Liner vessels will not be handled by special arrangement.

**1568**

tract principles because it is generally economically efficient to allow private parties to allocate the costs and risks involved in doing business. As a long line of Texas land-based decisions indicate, there is no public policy which requires this Court to invalidate Agri's indemnity provisions. *See, e.g., Gulf Oil Corp. v. Burlington Northern Railroad, Inc.*, 751 F.2d 746 (5th Cir.1985) (and cases cited therein). The Fifth Circuit's recent water-borne decisions inevitably lead to the same conclusion. *See, e.g., Foreman v. Exxon Corp.*, 770 F.2d 490 (5th Cir.1985). Thus, this Court feels obligated to be guided by and adhere to the well-established principles found in both the Fifth Circuit and Texas court opinions.

### B. *Marubeni's Unilateral Promulgation Argument*

■ Marubeni contends that it cannot be held to the terms of Agri's tariff because it was not a signatory to the berthing application, which incorporates the tariff by reference, and was signed on July 2, 1982 by a representative of Shinwa Kaisha Kaiun, the operator of the vessel. Marubeni cites no references in support of this proposition, and the argument may be summarily disposed of through resort to traditional principal-agency principles. *See, e.g., Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, *reh'g denied*, 634 F.2d 1355 (5th Cir.1980); *Sun Oil Co. v. Behring Properties, Inc.*, 480 F.2d 310 (5th Cir.), *cert. denied*, 414 U.S. 1039, 94 S.Ct. 539, 38 L.Ed.2d 329 (1973), *reh'g denied*, 414 U.S. 1138, 94 S.Ct. 886, 38 L.Ed.2d 764 (1974).

■ It is well-established that where one instrument refers to another instrument in specific terms which clearly shows an intent to make it part of the contract, both instruments are to be construed together. *See Houston E. & W. T. Ry. Co. v. Trentem*, 63 Tex. 442 (1885). Similarly, maritime contracts may validly incorporate by reference terms from other documents or agreements. *See Sun Oil Co. v. Dalzell*

*Towing Co.*, 55 F.2d 63 (2d Cir.), *aff'd*, 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311 (1932).

Agri relies upon *Rorie v. City of Galveston*, 471 S.W.2d 789 (Tex.1971) for the proposition that the mere filing of a tariff with the Federal Maritime Commission makes a tariff uniformly applicable to all persons dealing with a terminal operator. It is not necessary, Agri argues, that the tariff be formally approved by the Commission, nor does it matter that the tariff is unilaterally promulgated. *See Rorie, supra*, at 792–93.

This Court observes, however, that the proposition stated in *Rorie*, and relied on by Agri here, is not without limitation. In *Port of Tacoma v. Duval*, 364 F.2d 615 (9th Cir.1966), for example, the Ninth Circuit held that the mere filing and publication of a tariff does not charge a vessel owner with constructive notice of provisions which are not required by law to be inserted therein. *See id.* at 617. Marubeni has not, however, raised the issue of notice, and cannot, as a consequence of the berthing application. Moreover, Agri asserts that it has provided Marubeni with a copy of the tariff. This Court therefore concludes that the provisions of Agri's tariff, insofar as they are valid under other rules of law, are enforceable against Marubeni in this case even though the tariff was unilaterally promulgated.

### C. *Marubeni's Interpretation of Contract Argument*

■ To the extent that the result would be dissimilar under Texas law, Marubeni is undoubtedly correct in contending that federal maritime law governs the interpretation of Agri's indemnity provisions. *See, e.g., Lirette v. Popich Bros. Water Transport, Inc.*, 699 F.2d 725, 728 n.11 (5th Cir. 1983). Since the Court sees no conflict between federal maritime law and Texas law concerning the issues raised in the case at bar, however, it relies on the language of the particular indemnity clauses and on established general principles of interpretation of both tariff and indemnity provisions to reach its holding in this case. Indeed,

the determination to place liability upon Agri actually turns on basic contract law.

In reaching a decision, this Court has been guided by several principles of law. First, this Court observes that the interpretation of tariffs is no different from the construing of any other contract or document. *See, e.g., Great N. Ry. v. Merchants Elevator Co.,* 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922); *Western Transportation Co. v. Webster City Iron & Metal Co., Inc.,* 657 F.2d 116 (7th Cir.1981); *Penn Central Co. v. General Mills, Inc.,* 439 F.2d 1338, 1340 (8th Cir.1971). Second, a tariff should be construed strictly against the drafter of the tariff, as a corollary to the rule that written instruments will be construed strictly against their drafters. *See, e.g., United States v. Great N. Ry.,* 337 F.2d 243, 249 (8th Cir.1974); *Nat'l Van Lines, Inc. v. United States,* 355 F.2d 326, 333 (7th Cir. 1966); *Penn Central Co., supra,* at 1341. Third, any ambiguity or doubt must be decided against the drafter of the tariff, but such a rule should not be followed where it is outweighed by other equally settled and applicable rules of construction. *See id.* Finally, in *Weathersby v. Conoco Oil Co.,* 752 F.2d 953, 955 (5th Cir.1984), and *Lirette v. Popich Bros. Water Transport, Inc.,* 699 F.2d 725, 728 (5th Cir.1983), this Court has been directed to interpret maritime contracts containing indemnity provisions consistently with their plain meaning unless the provisions are ambiguous. Thus, this Court "should construe [an] indemnity clause to cover all losses 'which reasonably appear to have been within [the parties'] contemplation.'" *Kemp v. Gulf Oil Corp.,* 745 F.2d 921, 924 (5th Cir.1984) (quoting *Corbitt v. Diamond M. Drilling Co.,* 654 F.2d 329, 333 (5th Cir.1981) (applying federal maritime law).

Under both Texas law and federal maritime law there is a long-established general principle which requires that indemnification for an indemnitee's own negligence must be clearly and unequivocally expressed. *See United States v. Seckinger,* 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970). "Standing alone the indemnity clause has an established legal meaning. An indemnification of 'any and all claims' will not include the negligence of the indemnitee." *Seal Offshore, Inc. v. American Standard, Inc.,* 736 F.2d 1078 (5th Cir.1984) (citations omitted). Thus, indemnity "is an area in which to cover *all* does not include one of the parts." *Batson-Cook Co. v. Industrial Steel Erectors,* 257 F.2d 410, 414 (5th Cir.1958) (emphasis in original).

This Court perceives no distinction between the principles of federal maritime law and state law with regard to the determination of the issues presented here. Although the Texas rule has sometimes been considered an "express negligence rule," Texas does not require that the word "negligence" actually be used, but does require "that the parties state in so many words, that they intend to save the indemnitee harmless from liability for his own negligence." *Fireman's Fund Ins. Co. v. Commercial Standard Ins. Co.,* 490 S.W.2d 818, 822 (Tex.1972). In *Corbitt,* the Fifth Circuit addressed this same requirement for indemnity of one's own negligence, and stated:

> A contract to indemnify another for his own negligence imposes an extraordinary obligation. Thus an indemnitor is entitled to express notice that under his agreement, and through no fault of his own, he may be called upon to pay damages caused solely by the negligence of his indemnitee.

*Id.* at 333. The purpose of the "clear and unequivocal" rule is to give a contracting party "fair notice that under his agreement, and through no fault of his own, a large and ruinous award of damages may be assessed against him solely by reason of negligence attributable to the opposite contracting party." *Spence & Howe Construction Co. v. Gulf Oil Corp.,* 365 S.W.2d 631 (Tex.1963).

This Court is mindful of the Fifth Circuit's recent opinion in *Gulf Oil Corp. v. Burlington Northern Railroad, Inc.,* 751 F.2d 746 (5th Cir.1985). In that diversity

suit, the court interpreted and applied Texas law. *Id.* at 748. *Gulf Oil Corp.* is particularly relevant here because if Agri's indemnity provisions are to prevail, they must do so within the parameters of the standard set forth in that case. Since we find no repugnance between federal maritime law and the rule stated in *Gulf Oil,* we clearly find it instructive and will consider it here.

As the Fifth Circuit observed, the "specific premises or instrumentalities exception" is not an exception to the general rule of Texas law, but a specific application of the requirement that an indemnity of one's own negligence be clearly expressed. *See Gulf Oil, supra,* at 748 (interpreting *Eastman Kodak Co. v. Exxon Corp.,* 603 S.W.2d 208, 212 (Tex.1980). "For when indemnity is *clearly* expressed with reference to specific instrumentalities or premises, the indemnitor necessarily knows that he is assuming full responsibility for losses in connection with those particular premises or instrumentalities regardless of whose negligence may cause the losses." *Id.*

■ At first blush, the hold harmless provisions at issue in the instant action appear to be governed by the rule stated in *Gulf Oil.* Agri thus would win this indemnity dispute with Marubeni. Closer analysis indicates, however, that any resemblance between the respective indemnity provisions is superficial and that the fair notice to the indemnitor objective has not been satisfied in this case in which the indemnitee operates a grain elevator and loading terminal and contracts pursuant to the disputed tariff.

The Fifth Circuit first considered the indemnity provisions at issue in *Houston & Texas Central Railroad Co. v. Diamond Press Brick Co.,* 111 Tex. 18, 222 S.W. 204, *modified on reh'g on other grounds,* 111 Tex. 18, 226 S.W. 140 (1920), and then compared them with Burlington's indemnity provision. *See Gulf Oil, supra,* at 748–49. The provisions at issue in the instant action pose a striking contrast to the indemnity provisions upheld in both *Houston & Texas Central Railroad Co.* and *Gulf*

*Oil.* In those cases, the instrumentalities or operations and premises were narrowly and specifically defined, while the clauses identifying the covered sources or causes of injury were all-encompassing. The indemnity clause in *Gulf Oil* recited that the indemnitor would hold the indemnitee harmless for loss *"in any manner caused by,* resulting from or incident to *storage of private cars on said track." Id.* at 747–48 (emphasis added). In a similar manner, the indemnitor in *Houston & Texas Central Railroad Co.* contracted to "save [the indemnitee] harmless from any and all claims for damages *arising from any cause whatsoever* growing out of the construction, maintenance and *operation of a spur track."* (emphasis added). Thus, the indemnitors received the requisite fair notice of their extraordinary liability exposure including that for negligence of the indemnitee when premised upon incidents involving the narrowly defined instrumentalities and operations related to the tracks in question.

In contrast to the provisions considered above, the indemnitors, designated as users under the relevant tariff provisions in the case at bar, were obligated to hold harmless the indemnitee Agri for damages "resulting from *their operation at the elevator or use of the elevator facilities,"* (Item 222) and those "incident to, arising out of or in connection with *user's entering upon the premises of the elevator operator,* and custody, possession, use or operation of the elevator operator's equipment, *or failure of such equipment to operate."* (Item 226) (emphasis added). Thus, it is apparent that the hazy operational limits of the respective clauses now under scrutiny have little, if any, similarity to the more precise provisions validated in *Gulf Oil.* In sum, the operations and instrumentalities in this case are loosely defined and largely unspecified and do not afford fair notice to the indemnitor of his liability exposure under the tariff.

Without resorting to a strained or unreasonable interpretation, it is also entirely possible for the indemnitor to conclude

from the language of the tariff that it has only promised to hold the indemnitee harmless for injuries arising from the user's *own* activities and/or from those caused by equipment malfunctioning.[6] This inherent ambiguity is compounded by Item 226, No. 2 of the Tariff which disclaims express and implied warranties but states that all equipment provided by the elevator "shall be presumed to be in good operating condition when turned over to user or when made use of by the user."

Since this Court concludes that Marubeni could reasonably have interpreted the indemnity provisions to mean that Agri intended to protect itself only from claims of strict liability or claims which arise from the user's own activity, it is compelled to construe the provisions against Agri, the drafter of the tariff. Furthermore, the "any and all claims" language of Agri's Tariff provisions does not aid this Court in validating the hold harmless agreement. Such language, because it has a well defined legal meaning which traditionally *excludes* exculpation for the indemnitee's own negligence, only serves to obscure even further the contemplated meaning of the provisions at issue. Inasmuch as this Court is not able to ascertain the intent of the parties with certainty, it follows that Agri's indemnification provisions are unenforceable against Marubeni here.

This Court is aware of Circuit Judge John R. Brown's sage admonition to "resist the temptation to take the ambiguity route as an easy and quicker way out" when interpreting tariff provisions. *Louisville & Nashville Railroad Co. v. Knox Homes Corp.*, 343 F.2d 887, 891 (5th Cir.1965). It is also aware that courts have been charged on occasion with divining "some ambiguity" in a critical legal document in order to rationalize a given legal result.

Thus, the Court has examined with considerable care the respective positions of the contracting parties and attempted to identify the contemplated meaning that can be extracted from the key language of the tariff. As a consequence, given the prevailing rules of construction applicable to indemnity provisions, the Court is unable to conclude that the provisions at issue are sufficiently clear and unequivocal to provide Marubeni with the requisite fair notice that it has assumed the extraordinary legal obligation to exculpate Agri from liability for its own negligence.

Accordingly, it is ORDERED, ADJUDGED and DECREED that Marubeni's motions for judgment on the plaintiff's claim and for judgment on the cross claim asserted by defendant Agri for indemnity must be, and the same are hereby, GRANTED.

---

**6.** Adding to the confusion leading to this Court's conclusion that ambiguity exists is the precise language of Item 222 of the tariff. The indemnitors or contracting parties with Agri Export Cooperative (singular) are designated as *all users* (plural). Indemnificatin occurs when claims are filed for injuries or damages "incident to or resulting from *their operation at the elevator* or use of the elevator facilities." The obvious grammatical reference back to "their operation" is "all users," (plural); it cannot be Agri (singular). Again, this is evidence of ambiguity and of a lack of fair notice to the indemnitor of the scope of its legal contractual undertaking as contended for by Agri.