**MARINE OVERSEAS SERVICES, INC.,**
**Plaintiff-Appellant Cross-Appellee,**

v.

**CROSSOCEAN SHIPPING CO., INC.,**
**Defendant-Appellee Cross-Appellant,**

**Muhammadi Steamship Co.,**
**Defendant-Appellee.**

No. 85–2029.

United States Court of Appeals,
Fifth Circuit.

June 16, 1986.

Rehearing Denied Aug. 18, 1986.

Ross, Griggs & Harrison, H. Lee Lewis, Jr., Victoria C. Blanks, Houston, Tex., for plaintiff-appellant cross-appellee.

Royston, Rayzor, Vickery & Williams, Kenneth D. Kuykendall, Houston, Tex., for defendant-appellee cross-appellant.

Before GOLDBERG, HILL, and JONES, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

The central issue presented by this admiralty case is whether a party in breach of a contract of affreightment is entitled to an offset reflecting the injured party's failure to repay loans taken out from the injured party's customers. We hold that the district court erred in allowing such an offset, and we reverse and remand.

## I. BACKGROUND

### A. *Facts*

In the summer of 1975, Marine Overseas Services, Inc., ("Marine Overseas") was engaged in the export service business and as a part of its business acted as a broker in booking ocean cargo for freight forwarders. Marine Overseas acted as local agent for Serviocean International, Inc., and solicited cargo in the Houston and New Orleans areas for Serviocean vessels calling in ports along the Gulf of Mexico. In June 1975, Marine Overseas booked approximately 6,500 tons of cargo for shipment to the Middle East aboard the Serviocean vessel M/V Dona Gisella. Because of mechanical problems the Dona Gisella did not make its expected calls at Gulf ports. By the time Marine Overseas learned of the Dona Gisella's cancellation of its voyage, the cargo had already been delivered to the dock for loading and the freight forwarders requested that Marine Overseas rebook the cargo.

On July 22, 1975, William D. Rasco, Jr., a vice president of Marine Overseas, contacted a New York shipping agency and arranged to book the cargo on the M/V Al Kulsum through Century Lines, Inc. The Al Kulsum was owned and operated by Muhammadi Steamship Company ("Muhammadi"); its general agent was Crossocean Shipping Company, Inc. ("Crossocean"). Century Lines had chartered the vessel from Crossocean. Loading of the cargo aboard the Al Kulsum began on July 23. Later that day, Crossocean notified Marine Overseas that Century had failed to book enough cargo to satisfy the terms of the charter party with Muhammadi and there-

fore the charter party between Century and Crossocean had been canceled. In order to retain the space it had previously booked on the Al Kulsum, Marine Overseas began negotiations with Crossocean that same afternoon.

The parties took different views of these negotiations. Marine Overseas claimed that in the course of a telephone conversation on the afternoon of July 23, Rasco and Marko Zaja of Crossocean reached agreement on a contract of affreightment under the terms of which Marine Overseas would book the cargo aboard the Al Kuslum at a freight rate of $75 per ton, with Marine Overseas being allowed a 5% commission. According to Marine Overseas, the total amount due Crossocean pursuant to this agreement was $308,000. Crossocean claims that during this telephone conference, or in the course of a subsequent exchange of telexes, the parties reached a somewhat different agreement, under the terms of which the cargo would be carried aboard the vessel under a "space charter" for a lump sum of $350,000.

The Al Kulsum, loaded with 4,300 revenue tons of cargo booked by Marine Overseas, departed from Houston on July 28 with the terms of carriage still in dispute. On August 18, Marine Overseas sent a telex to Crossocean "confirming" that it owed Crossocean freight of $75 per ton for the cargo originally booked with Century and $90 per ton for additional cargo of vegetable oil Marine Overseas had booked on the Al Kulsum following the collapse of the Century charter, minus a 5% commission. Marine Overseas calculated the total freight charge to be $311,826.90. On August 22, Crossocean replied that it understood their agreement to provide for a lump sum charge of $350,000 to cover all of the cargo except the vegetable oil for which an additional $3,535.71 (or $90 per ton) was to be paid and that no commission was to be paid Marine Overseas. Crossocean demanded immediate payment of the total amount and stated that if payment was not forthcoming Crossocean would not release bills of lading for the cargo.

Thereafter, relations between Marine Overseas and Crossocean became more strained. Crossocean charged that Marine Overseas was providing its customers with false bills of lading. Crossocean informed the freight forwarders that they would have to renegotiate the terms of carriage directly with Crossocean and that they must pay freight charges directly to Crossocean or Crossocean would collect freight from the recipients at the ports of discharge.

On October 7, in a meeting attended by representatives of the freight forwarders, Marine Overseas and Crossocean, a representative of Marine Overseas signed a charter party with Crossocean providing for payment of a lump sum freight of $350,000. Marine Overseas had already paid $266,509.20 to Crossocean out of the $402,447.57 Marine Overseas collected from its freight forwarders after expenses. Crossocean demanded the difference between the amount due under the charter party and the amount already paid, a sum Crossocean says was $83,283.83.[1]

At the time of this demand, Marine Overseas did not have funds available to pay the extra freight required by Crossocean; the record does not indicate how Marine Overseas disposed of the remainder of the net collections beyond the $266,509.20 already paid. The freight forwarders agreed to lend Marine Overseas the money necessary to cover the additional $83,283.83. The freight forwarders issued checks to Marine Overseas for the additional freight demanded by Crossocean on their respective cargos. Marine Overseas endorsed these checks over to Crossocean. One freight forwarder, Harper Robinson & Company ("Harper Robinson"), issued a check directly to Crossocean in the amount of $25,000 in order to ransom its cargo from the Al Kulsum; Marine Overseas then executed a promissory note in that amount to Harper Robinson. This note was subsequently assigned to the shipper, Paccar International,

Inc., ("Paccar"), who later appeared in the guise of intervenor in this case.

## B. *Prior Proceedings*

Marine Overseas instituted this admiralty action against Crossocean, Muhammadi, and others to recover the excess freight paid to Crossocean. Marine Overseas alleged that it had consummated a contract of affreightment with Crossocean during the telephone conversation between Rasco and Zaja on the afternoon of July 23 under the terms of which the total freight was to be computed at the rate of $75 per ton and the total amount due was $308,467.57, rather than the $350,000 claimed by, and ultimately paid to, Crossocean. Marine Overseas also sought additional damages totaling $3,247.60 to cover the cost of tarps which Marine Overseas purchased in order to protect cargo stored on the deck of the Al Kulsum. Marine Overseas claimed that the agreement with Crossocean provided for underdeck stowage. Paccar, in its complaint in intervention, alternatively sought to recover the $25,000 in freight charged by Crossocean above and beyond that provided by the agreement with Marine Overseas or to recover the amount of the debt evidenced by the promissory note from Marine Overseas.

Crossocean and Muhammadi answered claiming that the charter party signed by Marine Overseas on October. 7 embodied the agreement between the parties and that Marine Overseas had no cause of action for damages against Crossocean. Crossocean and Muhammadi also counterclaimed for the difference between the freight charged pursuant to the charter party which Marine Overseas signed under protest, $350,000, and the freight which would have been due under the defendants' tariff in the absence of any charter party.

Following a nonjury trial, the district court found that the parties did not reach a meeting of the minds as to the terms of shipment during the July 23 telephone con-

---

1. The difference between $350,000 and $266,509.20 is actually $83,490.80, not $83,283.83.

This discrepancy is not explained in the record.

versation. The court also found that the parties never executed a valid charter party agreement and that consequently Muhammadi was a common carrier statutorily obligated to charge freight in accordance with the tariff rate. The court found that the full freight due in accordance with Muhammadi's tariff was $549,596.64 and therefore entered judgment for Crossocean and Muhammadi on their counterclaim in the amount of $196,060.36, representing the difference between the freight owed under the tariff and the freight actually collected. The court further held that Marine Overseas was entitled to no reimbursement for expenditures arising out of on deck stowage of the cargo because there was no proof that the defendants were obligated to provide below deck storage. Paccar's claim in intervention against Crossocean was dismissed; however, the court entered judgment in Paccar's favor, and against Marine Overseas, on the $25,000 note.

On appeal this court held that the district court clearly erred in finding that Marine Overseas and Crossocean did not enter into a private contract of affreightment at the time of the telephone conference of July 23. *Marine Overseas Services, Inc. v. Crossocean Shipping Co., Inc.*, 647 F.2d 1117 (5th Cir.1981) [*"Marine Overseas I"*]. The unpublished panel decision reversed the judgment for Crossocean on its counterclaim for sums due in accordance with its tariff, and ordered the case "remanded to the district court for a determination of a reasonable price under the circumstances of the carriage services performed by the M/V Al Kulsum." *Id.* at 10. The panel authorized the district court to receive new evidence if necessary to make this determination. On Marine Overseas' other claim, for sums expended on tarps to protect cargo stored on deck, the panel held that an explicit agreement was not necessary to impose on Crossocean an obligation to protect the cargo, and directed entry of judgment in favor of Marine Overseas for this sum, or $3,247.60. The panel affirmed Paccar's judgment against Marine Overseas on the $25,000 note.

After issuance of the mandate of this court, the defendants presented two further issues to the district court which had never before been specifically raised. First, Crossocean and Muhammadi contended that Crossocean could not be liable to Marine Overseas because Crossocean was acting only as an agent for Muhammadi. Second, they argued that Marine Overseas could not recover any damages on the contract, reasoning that any extra money paid to meet Crossocean's demand for $350,000 in freight came ultimately not from Marine Overseas but from its freight forwarders, the source of the loans to Marine Overseas.

On remand, the district court determined that the reasonable price of carriage for the cargo aboard the Al Kulsum was $306,-375. The district court initially ordered judgment in favor of Marine Overseas for $43,625, the difference between the reasonable carriage price ($306,375) and the price demanded and received by Crossocean ($350,000). The court also ordered entry of judgment in favor of Marine Overseas for the additional sums expended on tarps, or $3,247.60.

On reconsideration, the district court eliminated the $43,625 award for breach of contract because it concluded that Marine Overseas had sustained no actual loss. The district court reasoned that Marine Overseas had actually come out ahead in the deal:

[T]he reasonable rate of carriage ... was $306,375.00. However, Marine Overseas collected $402,447.57 after expenses, and paid defendants only $266,509.20, ... thus retaining a profit of $135,938.37. If the contract had been performed by payment of $306,375.00 on October 7, 1975, plaintiff's "expectation interest" of $96,-072.57 would have been met, but the failure to perform and pay the reasonable price for the carriage of the cargo provided plaintiff an additional profit of $39,865.80. Therefore, even if plaintiff subsequently pays the $25,000.00 due and owing the intervenor, Marine Over-

seas will have an increased profit of $14,-865.80 as a result of this dispute.

*Marine Overseas Services, Inc. v. Crossocean Shipping Company, Inc.,* C.A. No. 76–H–887 at 3 (S.D.Tex. Oct. 9, 1984) [*"Marine Overseas, II"*]. The court thus amended its prior order and awarded no damages beyond the $3,247.60 award to Marine Overseas for tarps. The court entered judgment for $3,247.00 plus 6% prejudgment interest from September 1975. The judgment ran against both Crossocean and Muhammadi, the district court holding that Crossocean's liability was settled by the appellate opinion. Marine Overseas and Crossocean appeal.

## II. DISCUSSION

### A. *Liability of Crossocean*

Crossocean appeals that portion of the judgment holding it jointly liable with Muhammadi. Crossocean claims that as an agent for an identified principal, it could not itself be liable for dealing with Marine Overseas on behalf of Muhammadi. *See Interocean Shipping Co. v. National Shipping and Trading Corp.,* 462 F.2d 673, 678 (2d Cir.1972) (citing Restatement (Second) of Agency § 320 (1958)). A joint pretrial order, filed prior to the district court's initial resolution of the case, stipulated that Crossocean was "acting as agent" for Muhammadi; the district court accepted this stipulation and found that the Al Kulsum's "general agent in the United States" was Crossocean. However, Crossocean did not raise the effect of its status as an agent on its liability to Marine Overseas until remand after appeal.

The district court's determination of this issue did not reach the merits but rested on the assumption that the doctrine of law of the case applied. The district court relied on language in the appellate opinion that "an explicit agreement was not necessary to impose .. an obligation [to carry the cargo below deck] on Crossocean.... Thus, judgment should be entered in favor

of Marine Overseas." *Marine Overseas I* at 11. The appellate opinion also stated "We therefore reverse the judgment of the district court ... for Crossocean on its counterclaim for sums due in accordance with its tariff and order that the cause be remanded...." *Id.* at 10. The district court held that the panel opinion conclusively resolved the agency issue adversely to Crossocean.

■ The law of the case doctrine here operates to "preclude a re-examination of issues of law decided on appeal, explicitly or by necessary implication, either by the district court on remand or by the appellate court in a subsequent appeal." *Chapman v. NASA,* 736 F.2d 238, 241 (5th Cir.1984). The doctrine does not bar consideration of issues that might have been, but were not actually resolved in the earlier proceeding. *Id.* We must therefore determine what issues were decided on the prior appeal to determine whether we are precluded from re-examining the agency issue.

. The prior panel decided that (1) Marine Overseas and Crossocean entered into a private contract of affreightment on July 23, 1975, and (2) Crossocean violated its implicit obligation to carry the cargo below deck.[2] The panel was not presented with, nor did it expressly consider, the issue of an agent/principal relationship and its effect on Crossocean's liability. The panel remarked in its statement of facts that Crossocean was a general agent for Muhammadi but did not state whether this fact had any effect on liability.

■ We conclude that the district court erred by reading the prior panel opinion too broadly. The panel did not order entry of judgment *against* Crossocean, but only *in favor* of Marine Overseas for duties violated by Crossocean. Such a finding is entirely consistent with the contention that Crossocean is not liable, as a mere agent, but that its acts created liability for its principal Muhammadi. Nothing in the previous

---

**2.** The panel also determined two other issues which are not pertinent here: (1) that Paccar's intervention was proper, and (2) that the district

court did not abuse its discretion in refusing to allow Marine Overseas to amend its complaint to allege a claim for punitive damages.

opinion suggests that this court intended to address or necessarily must have addressed the issue of Crossocean's ultimate liability as an agent.

■ However, the fact that the prior panel did not address the agency question raises another aspect of Crossocean's proferred defense. Crossocean, from the filing of its answer through the resolution of the first appeal, never argued this theory as a defense to its liability. Marine Overseas now contends that Crossocean has waived this affirmative defense. A party is required to set forth all affirmative defenses in a responsive pleading. Fed.R.Civ.P. 8(c). Generally, an affirmative defense not pled is considered waived. *E.g., Mozingo v. Correct Manufacturing Corp.,* 752 F.2d 168, 172 (5th Cir.1985); 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1278 at 339 (1969). An attempt to use seriatim theories of defense is disallowed. *See Trinity Carton Co. v. Falstaff Brewing Corp.,* 767 F.2d 184, 194 (5th Cir.1985).

■ Even if we assume that agent status is an affirmative defense, we conclude that Crossocean has given fair notice of its defense to Marine Overseas throughout this litigation. The pleading of affirmative defenses is governed by the same liberal standards as those for a complaint. *See* 5 C. Wright & Miller, *supra,* § 1274 at 323. Such averments are to be "simple, concise, and direct," and will be "construed

as to do substantial justice." *See* Fed.R. Civ.P. 8(e)(1), 8(f). Crossocean's answer stated that Mr. Zaja of Crossocean was acting on behalf of the vessel owner. The joint pretrial order and the district court's original findings of fact establish that the parties were well aware of the claimed agency relationship. Crossocean called the district court's attention to this issue when on remand the possibility of an adverse judgment for damages became apparent. The district court erred in failing to consider the agency issue, and we remand for a determination of Crossocean's defense.[3]

## B. *Damages*

### 1. *Law of the Case.*

Marine Overseas vigorously argues that the district court's determination that it suffered no loss on the contract violated the mandate of the panel opinion and thus the doctrine of law of the case. It contends that the district court improperly permitted Crossocean and Muhammadi to relitigate liability by raising new issues on remand that were not raised or considered at trial or on the previous appeal. Marine Overseas places great weight on the language of the remand for "a determination of a reasonable price under the circumstances of the carriage services performed by the M/V Al Kulsum." *See Marine*

---

**3.** We have assumed, without deciding, throughout this discussion that Crossocean was required to disclose the identity of its principal Muhammadi in order to escape liability to Marine Overseas. However, two consolidated cases currently pending before this Court present the question of whether this assumption is correct. *Port Ship Service, Inc. v. International Shipping Management and Agencies Services, Inc.* (No. 85–3723); *Port Ship Service, Inc. v. Astral International Shipping Services, Inc.* (No. 85–3724). The *Port Ship* appeal asks this Court to determine whether an agent must disclose the identity of its actual principal (e.g. vessel owner) or whether disclosure of the name of the vessel it represents is sufficient. We express no opinion as to the possible outcome of this appeal, but mention it for the benefit of the potential guidance it may offer the district court here on remand. We have decided not to preempt the *Port Ship* appeal because neither side here

has briefed, argued, or apparently fully recognized this issue. The district court may wish in its discretion to defer a ruling on remand until resolution of *Port Ship.*

We remand, rather than decide the issue on appeal, in part because factual determinations may have to be made if Crossocean was required to disclose the identity of its principal. For example, Marine Overseas contends that at the time it entered the contract Crossocean had not disclosed the extent of Muhammadi's involvement. However, if Crossocean needed only to disclose that it acted on behalf of the Al Kulsum, then the determination may be simpler. Marine Overseas has not contended here that it was unaware of Crossocean's relationship with the Al Kulsum. In any event, we recognize that the district court may elect to make any additional fact-finding on the basis of the record as it is already developed, without the necessity of additional discovery or court proceedings.

*Overseas I* at 10. We find this contention to be without merit.

■ The previous panel was well aware that Marine Overseas had not paid the freight exclusively from its own funds, but it declined to instruct the district court on how to treat this factor. Because the issue of Marine Overseas' damages was not reached at the first district court proceeding, the panel's instruction to determine the reasonable price of Muhammadi's services cannot be construed in a way to foreclose subsequent consideration of other factors, such as mitigation, which normally play a part in the calculation of damages. As we have noted above, law of the case doctrine does not extend to issues previously unresolved. *Chapman,* 736 F.2d at 241. The mandate of the prior appeal was not to award the reasonable cost of carriage but rather to calculate damages based on the reasonable cost of carriage. *See Motto v. United States,* 360 F.2d 643, 646 175 Ct. Cl. 862 (1966) (mitigation is issue distinct from liability).

### 2. *Loss Avoided*

■ As the prior panel observed, charter party agreements are essentially contracts and they are subject to the general rules of contract law. *See* 10 *Williston on Contracts* § 1072 at 26 (3d ed. 1967) ("[a] charter is formed as soon as the traditional elements of a contract are present, such as consideration, offer and acceptance, mutuality of asset...."); *see also* G. Gilmore & C. Black, *The Law of Admiralty* § 4–1 at 196 (2d ed. 1975) ("since most points of charter law involve construction of the charter, the principles are much the same as those of ordinary contract law"). We begin, as did the district court, with the basic proposition that the measure of contract damages is based on the injured party's expectation interest. *E.g.,* Restatement (Second) of Contracts § 347 at 112 (1981).

The district court in its original decision on remand came to a straightforward as-

sessment of Marine Overseas' expectation interest. The court found that Marine Overseas had paid $350,000 to Crossocean when the reasonable price of carriage, based on the oral contract, was only $306,-375. The difference between what Marine Overseas actually paid and what it should have paid, an amount of $43,625, was thus initially awarded as damages on the contract. The problems leading to this appeal arose when the district court reconsidered its use of this approach.

Marine Overseas' major contention in this appeal is that the district court erred in later finding that it suffered no loss as a result of the breach by Crossocean. Marine Overseas contends that it should have been awarded its expectancy interest, without any deduction for money loaned to it by its freight forwarders. Thus, it claims the district court misapplied a "loss avoided" rule of contract damages. We agree.

In order to reveal the mistake in the district court's reasoning, we first must explain our view of what that reasoning was. The court found that Marine Overseas had originally collected $402,447.57, after expenses, from its freight forwarders. Out of these funds Marine Overseas had paid Crossocean $266,509.20, thus, according to the court, retaining a "profit" of $135,938.37. However, this amount was *not* its profit on the transaction, for Marine Overseas still had to *borrow* over $83,000[4] from its freight forwarders to meet the amount demanded by Crossocean, $350,000. The district court could have viewed the $135,938.37 as "profit" only if it viewed the money borrowed from the freight forwarders as some sort of windfall to Marine Overseas occasioned by Crossocean's breach.

The district court went on to reason that if the reasonable carriage price of $306,-375.00 had been charged, then Marine Overseas' profit (or "expectation interest," as the court put it) would have been this sum subtracted from the $402,447.57 in net

---

**4.** This figure had been rounded off because of the unexplained discrepancy between the

amount Marine Overseas borrowed and the amount it paid. *See supra* note 1.

collections, or $96,072.57. Apparently the court assumed that under this scenario Marine Overseas would pay the entire carriage price itself, without receiving any extra funds from its freight forwarders. By comparing the "expectancy interest" of $96,072.57 with the realized "profit" of $135,938.37, the court concluded that Crossocean's breach had actually caused Marine Overseas to accrue "an additional profit" of $39,865.80. Since Marine Overseas seemingly had not suffered a loss, but actually came out ahead from the breach, the court awarded it no damages on this claim.

The "additional profit" realized by Marine Overseas was illusory. For whatever reason, Marine Overseas did not have funds on hand to meet an amount above $266,509.20. As it happened, Marine Overseas had to borrow over $83,000 from its freight forwarders to pay the higher price of $350,000 demanded by Crossocean. However, had the reasonable carriage fee instead been charged, Marine Overseas would only have been required to borrow the difference between $306,375 and $266,-509.20, or $39,865.80. No amount of recalculation can refute the fact that, because of Crossocean's breach, Marine Overseas had to incur an additional liability of over $43,000. However viewed, Marine Overseas' loss was the same: the difference between what it should have paid and what it actually did pay.

At the crux of the dispute is the nature of the amounts loaned by the freight forwarders to Marine Overseas to allow payment of the higher freight charged by Crossocean. Throughout this litigation it has been patently clear that at the time they were made these were loans, not mere excess payments. William D. Rasco, Jr., one-time senior vice president of Marine Overseas, testified without contradiction that these were loans. William H. Rasco, Sr., then president of Marine Overseas, corroborated this testimony in his deposition. The only evidence on this point from the

freight forwarders came from the branch manager of Harper Robinson, who testified unequivocally that the extra $25,000 advanced to Marine Overseas was a loan, the repayment of which was not dependent on resolution of Marine Overseas' dispute with Crossocean. The district court's original findings of fact, prior to the first appeal, stated that at the October 7, 1975, meeting it was agreed that Marine Overseas would, under protest, sign a charter party with the defendants, agreeing to pay a lump sum freight of $350,000, and that the freight forwarders would lend plaintiff the money necessary to cover the additional freight. The prior panel opinion also noted that the freight forwarders "agreed to lend" Marine Overseas the additional amounts. *Marine Overseas I* at 4.

The district court on remand never made a finding contrary to the proposition that these payments were loans when made. The court did find, however, that they remained outstanding debts: "... plaintiff has not repaid, nor does it intend to repay, any of the shippers or freight forwarders any portion of the $83,283.83 collected."[5] *Marine Overseas II* at 4. The court did not suggest that Marine Overseas' failure to repay, or its intention not to repay, was sufficient to extinguish the debts. Nor does Crossocean contend that these debts could be eliminated so easily.

The district court apparently recognized that at least some portions of the loans were not a windfall to Marine Overseas. The court reasoned that "even if [Marine Overseas] subsequently pays the $25,000 due and owing the intervenor [Paccar], Marine Overseas will have an increased profit...." *Id.* at 5. This reflected the indisputable nature of the $25,000 advanced to Marine Overseas from Harper Robinson, which was evidenced by a written promissory note subsequently assigned to Paccar. Although written promissory notes were not placed in evidence for the remainder of the loans, neither the district court nor the

---

5. The testimony of William D. Rasco, Jr., was to the contrary. He stated at least some of these loans were repaid. The district court did not

mention whether it credited or even considered this testimony.

parties have indicated why this factor would be crucial. As the prior panel held, "Admiralty does not disapprove of oral contracts and indeed such agreements have long been held valid." *Marine Overseas I* at 7 (citing *Kossick v. United Fruit Co.*, 365 U.S. 731, 734 & n. 4, 81 S.Ct. 886, 889 & n. 4, 6 L.Ed.2d 56, 60 & n. 4 (1961)). Indeed, the contract of affreightment was itself oral; it would be perverse to hold that collateral oral contracts were unenforceable.

■ Accordingly, we hold that the district court was correct initially on remand in assessing contract damages of $43,625. The court erred in later eliminating these damages, and we must reverse and direct entry of judgment in this amount for Marine Overseas.

### C. *Prejudgment Interest*

■ Marine Overseas complains that the district court's award of 6% prejudgment interest on the amount expended for tarps was too low; it suggests that 10% would be proper instead. "As a general rule, prejudgment interest should be awarded in admiralty cases—not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled." *Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. 1980). "Admiralty courts in setting these [prejudgment interest] rates have broad discretion and may look to state law or other reasonable guideposts indicating a fair level of compensation." *Todd Shipyards Corp. v. Auto Transportation, S.A.*, 763 F.2d 745, 753 (5th Cir.1985). The district court here looked to the Texas statutory prejudgment interest rate for "accounts and contracts" of Tex.Rev.Civ.Stat. Ann. art. 5069–1.03 (Vernon Supp.1986) in

arriving at its 6% figure.[6] We are unable to say that the district court abused its discretion in using this statute as a reasonable guidepost.

■ Finally, we reach the issue of prejudgment interest on the additional $43,625 sum to be awarded to Marine Overseas. The factors listed by the district court in awarding prejudgment interest on the tarp claim were (1) defendants had the use of Marine Overseas' money for what was at the time over nine years and (2) Marine Overseas, contrary to defendants' contentions, did not issue fraudulent bills of lading nor did it unnecessarily delay the prosecution of the case. These factors apply equally as well to Marine Overseas' additional award. Although prejudgment interest is normally a matter in the first instance for the district court, an appellate court may also require such an award. *See, e.g., Todd Shipyards*, 763 F.2d at 753. Thus, we direct the district court to award prejudgment interest on the $43,625. However, we do not instruct the district court to use any particular rate, for this decision must lie with the district court in the first instance. *Platoro*, 695 F.2d at 907.

### III. CONCLUSION

We reverse the judgment of the district court insofar as it eliminates the previously awarded contract damages, and we direct the entry of judgment in favor of Marine Overseas for the amount of $43,625.00 plus prejudgment interest. We remand for a determination of the rate of prejudgment interest to be awarded on this amount. We affirm that portion of the judgment awarding to Marine Overseas an additional $3,247.60 plus prejudgment interest at 6% from September 1975. We remand for a determination of whether the judgment

---

**6.** When no specified rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable.

Tex.Rev.Civ.Stat.Ann. art. 5069–1.03 (Vernon Supp.1986). We need not determine whether

this statute would apply had the dispute in question been governed by state law. A district court may be guided by a state rate, but is not bound by it. *See Platoro Ltd., Inc. v. Unidentified Remains of a Vessel*, 695 F.2d 893, 907 (5th Cir.1983). *Cf. Crown Central Petroleum Corp. v. National Union Fire Insurance Co.*, 768 F.2d 632 (5th Cir.1985) (discussing recent developments in Texas prejudgment interest law).

should run only against Muhammadi or against Crossocean and Muhammadi.

AFFIRMED in part, REVERSED in part and REMANDED.