896 F.2d 964
 1990 A.M.C. 2378, 30 Fed. R. Evid. Serv. 58
 John RANDOLPH and Jennie Randolph, Plaintiffs-Appellees,
and
Reliance Insurance Company, Intervenor,
v.
F. LAEISZ, Defendant-Appellant.
John RANDOLPH and Jennie Randolph, Plaintiffs,
v.
F. LAEISZ, Defendant-Third Party, Plaintiff-Appellant,
v.
I.T.O. CORPORATION, and Gulf and Southern Terminal
Corporation, Third Party Defendants-Appellees.
 Nos. 88-6147, 89-2391.
 United States Court of Appeals,
Fifth Circuit.
 March 23, 1990.
Rehearing Denied April 18, 1990.
Rehearing Denied May 3, 1990.
 
 Kenneth D. Kuykendall, Royston, Rayzor, Vickery & Williams, Houston, Tex., for F. Laeisz.
 Mithoff & Jacks, Robert Mithoff, Scott Rothenberg, Houston, Tex., for John & Jennie Randolph.
 Tom Fitzhugh, III, Fitzhugh & Associates, P.C., Houston, Tex., for I.T.O. & Gulf & Southern Terminal Corp.
 Britt K. Davis, Houston, Tex., for Reliance.
 Appeals from the United States District Court for the Southern District of Texas.
 Before HIGGINBOTHAM, SMITH, and DUHE, Circuit Judges.
 DUHE, Circuit Judge:
 
 
 1
 F. Laeisz, owner of the M/V INCOTRANS PROGRESS, contracted with Gulf and Southern Terminal Corporation to procure a stevedore to unload the vessel. Gulf and Southern, in turn, contracted with ITO Corporation to conduct the stevedoring operations and with Southern Dock Company to serve as the checker. John Randolph was employed by Southern Dock as a checker. Because the arguments of Gulf and Southern and ITO Corporation are identical at this point in the proceedings, they will be referred to collectively as ITO.
 
 
 2
 While unloading was underway John Randolph slipped and fell on the gangway of the M/V INCOTRANS PROGRESS. Randolph contended that earlier that day the vessel had placed the gangway over a fixed crane track and failed to honor ITO's request to remove it. Thereafter, the ITO employee operating the crane ran into and damaged the gangway. Tony Rigdon, ITO's stevedore superintendent, and Klaus Ramming, the vessel's third mate, inspected the damaged gangway; neither thought it necessary to halt the cargo operations to repair the gangway. Thirty minutes later Randolph's accident occurred.
 
 
 3
 Randolph and his wife sued Laeisz under 33 U.S.C. Sec. 905(b), alleging vessel negligence. Shortly before trial Laeisz filed a third party complaint seeking indemnity from Gulf and Southern Terminal Corporation and ITO Corporation. The trial court severed the principal and third party demands and proceeded to trial on the principal suit. The jury returned a verdict in favor of Randolph, finding Laeisz 100% negligent and awarding John Randolph $839,497.35 in damages and Jennie Randolph $50,000 for loss of consortium. Thereafter, in the severed action, the trial court granted ITO's motion for summary judgment and dismissed Laeisz' complaint. 707 F.Supp. 275.
 
 
 4
 Laeisz appeals the jury's award, objecting to several aspects of the Randolphs' economist's testimony, and protests the trial court's award of prejudgment interest calculated on the basis of Texas law. Laeisz also contests the trial court's grant of summary judgment in the severed action. His appeals are consolidated before this Court. We reverse the jury verdict as to damages and remand for a new trial on damages and reverse the district court's grant of summary judgment.Economic Testimony
 
 
 5
 Laeisz objects to the jury's award of $670,000 for lost wages ($95,000 past and $575,000 future), contending that the Randolphs' economic expert's calculations were improper. Absent a definite finding of error, this court is not at liberty to reverse the jury's award. Gautreaux v. Insurance Co. of North America, 811 F.2d 908, 913 (5th Cir.1987).
 
 
 6
 The Randolphs' economist testified that he first calculated the gross wage Randolph would have earned in 1984, the year of his injury, but for the accident by averaging the number of hours Randolph actually worked in the six years prior to his injury. He multiplied this average by the 1988 wage rate to derive Randolph's gross yearly income and used this figure as Randolph's wage to calculate Randolph's lost stream of income. Laeisz complains that the economist failed to consider the limitation on Randolph's earnings resulting from a union merger and should not have converted pre-1984 earnings to 1988 dollars.
 
 
 7
 Prior to April 1983 Randolph worked in both the clerk/checker union and in the longshore union. These unions merged in April 1983, resulting in a loss of hours available for Randolph to work. From April 1983 until July 1984, when Randolph's injury occurred, Randolph only worked in the clerk/checker union. The economist did not use the average of hours worked after the merger. There is no dispute that the union merger resulted in a loss of hours available for Randolph to work prior to his injury. Laeisz presented evidence that work hours available to members of the clerk/checker union decreased by 40% in the years 1984-1987.
 
 
 8
 The economist testified that he increased Randolph's actual earnings prior to injury (1979-84) to reflect "1988 dollars." Thus although Randolph's 1979 tax return showed that he earned $29,397, the economist increased this figure to $45,895 in 1988 dollars. The effect of this increase was to raise Randolph's average net wages from $24,442 to $30,289, the figure used in computing past and future wage loss. On cross-examination the economist explained that what he did was to convert Randolph's actual earnings to what he would have earned working at the same number of hours (average of 1979-1984) had he worked those hours in 1988 at the 1988 wage rate. This calculation assumed that the hourly wage rate in 1984 would continue to increase and that Randolph would work the same number of hours after his injury as he had during the period 1979-1984.
 
 
 9
 Finally, the economist reduced the past wage loss figures by 25% to account for taxes and work related expenses and by a further 20% to account for bad business conditions in the Houston area. The 20% reduction was also intended to take into account the effect of the union merger on Randolph's earning capacity. The economist imposed a similar 10% reduction, an "economy surcharge", for Randolph's future wage loss in 1988, 1989, and 1990. Beginning in 1991 the economist removed the 10% "economy surcharge" from the wage loss calculation because he assumed that the local economy would begin to improve and Randolph would gain increased union seniority.
 
 
 10
 Calculation of the lost income stream begins with the gross earnings of the injured party at the time of the injury. Culver v. Slater Boat Co., 722 F.2d 114, 117 (5th Cir.1983) (en banc), cert. denied, 467 U.S. 1252, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984) (Culver II ). Culver II requires the court to use Randolph's gross earnings at the time of injury. We need not rule on the validity of the economist's averaging the number of hours Randolph worked in the six years prior to his injury or of his conversion of 1984 dollars to 1988 dollars under Culver II because the record does not support the validity of the economist's actual mechanical calculations. His testimony on direct and cross examination was confusing at best and nothing else in the record clarifies how the economist reached his end result figures.
 
 
 11
 Furthermore, we find that other portions of the economist's testimony were clearly improper. Though an expert may give his opinion on a particular matter within the scope of his expertise, that opinion must be based on facts. Hernandez v. M/V Rajaan, 841 F.2d 582, 588 (5th Cir.1988). The economist's determination that a 20% (for the years 1984-87) and 10% (for the years 1988-90) reduction in lost wages was appropriate for market conditions and union merger was not based on any fact in the record. In this instance the expert's testimony served as substantive evidence rather than opinion interpreting facts in evidence. The economist's unsubstantiated belief that "presumably market conditions are improving all the time" does not suffice to justify the substitution of percentage reductions for actual hours worked and wages earned. See Gautreaux, 811 F.2d at 914-15; In re Air Crash Disaster at New Orleans, Louisiana, 795 F.2d 1230, 1233-34 (5th Cir.1986). Nor does he explain how the loss of available work was factored into the percentages.
 
 
 12
 Laeisz further objects to the figure used by the economist for calculation of post injury earnings. Randolph returned to work August 1, 1987 and earned $12,377 that year. The economist used this figure rather than a figure that would properly represent Randolph's earnings over an entire year. The economist admitted on cross-examination that Randolph's future earnings based on his actual earnings prior to trial would exceed $20,000 per year and that $12,377 represented Randolph's "partial earning capacity".
 
 
 13
 In Gautreaux, 811 F.2d at 914-15, this Court held that it was error for the economist to use the minimum wage in calculating the plaintiff's future earning capacity where the record clearly showed that his wage-earning capacity exceeded minimum wage. We find that Randolph's economist similarly erred.
 
 
 14
 The economist presented three work life expectancy figures: age 60, age 62.3 and age 65. He testified that the 62.3 age was based upon the United States Bureau of Labor Statistics computations. The official statistics themselves were not admitted into evidence. Laeisz asserts that the most recent report demonstrates that Randolph's work life expectancy at the time of his injury was 60.4. Laeisz cross-examined the economist on this point but failed to introduce evidence regarding the appropriate work life expectancy. On remand, the parties should be mindful that absent evidence that a particular person is likely to live and work a longer, or shorter, period than the average, computations should be based on the statistical average. Madore v. Ingram Tank Ships, Inc., 732 F.2d 475, 478 (5th Cir.1984).
 
 
 15
 In summary, we here echo the message given to our able trial colleagues in In re Air Crash Disaster at New Orleans, Louisiana, 795 F.2d 1230 (5th Cir.1986): "it is time to take hold of expert testimony in federal trials." Id. at 1234.
 
 Prejudgment Interest
 
 16
 Laeisz contends that the trial court erred in awarding prejudgment interest calculated on the basis of Texas law at ten percent per year compounded daily. He argues that prejudgment interest should be denied on the basis of the reasoning in Monessen Southwestern Ry. Co. v. Morgan, 486 U.S. 330, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988), where the Court held that prejudgment interest was inappropriate in FELA cases. 486 U.S. at 338-40, 108 S.Ct. at 1844. The Court noted that neither the FELA nor the general federal interest statute makes any mention of prejudgment interest. Monessen, 486 U.S. at 336-38, 108 S.Ct. at 1843. Furthermore, the Court relied on Congress' failure to amend the FELA to provide for prejudgment interest in the face of more than seven decades of judicial unanimity wherein state and federal courts have denied such prejudgment interest. Monessen, 486 U.S. at 338-40, 108 S.Ct. at 1844.
 
 
 17
 However, the same reasoning in the instant case leads to the conclusion that prejudgment interest is appropriate. Section 905(b) actions are general maritime actions for which prejudgment interest has been jurisprudentially sanctioned. Hernandez v. M/V Rajaan, 841 F.2d 582, 590 (5th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 530, 102 L.Ed.2d 562 (1988); Helaire v. Mobil Oil Co., 709 F.2d 1031, 1042-43 (5th Cir.1983) (though the awarding of prejudgment interest lies within the discretion of the trial judge, the allowance of prejudgment interest in maritime law is the rule rather than the exception). See also, Noritake Co., Inc. v. M/V Hellenic Champion, 627 F.2d 724, 728 (5th Cir.1980). Because Congress has made no indication that prejudgment interest is inappropriate in maritime cases, the award is upheld as proper.
 
 
 18
 As the Randolphs correctly point out, one measure of prejudgment interest that has been upheld as within a trial court's discretion is the prejudgment interest rate of the state in which the court sits. Bartholomew v. CNG Producing Co., 832 F.2d 326, 331 (5th Cir.1987); Marine Overseas Services, Inc. v. Crossocean Shipping Co., Inc., 791 F.2d 1227, 1236 (5th Cir.1986); Todd Shipyards Corp. v. Auto Transportation, S.A., 763 F.2d 745, 753 (5th Cir.1985). Thus the trial court's imposition of prejudgment interest at the rate of ten percent per annum compounded daily was permissible. However, such interest should run from the date each item of past damages was incurred. See Farmland Industries, Inc. v. Andrews Transport Co., 888 F.2d 1066, 1068 (5th Cir.1989); Simeon v. T. Smith & Son, Inc., 852 F.2d 1421, 1435 n. 16 (5th Cir.1988).
 
 
 19
 Laeisz also contends that the intervenor, Reliance Insurance Company, waived its right to prejudgment interest and therefore that the court erred in awarding such interest on $59,196.55, the amount paid by the intervenor in compensation and medical benefits and recovered by it. Laeisz points to no place in the record indicating such waiver by the intervenor and this Court's independent review of the record reveals no evidence of such a waiver. The judgment grants a total past actual damages award to Randolph of $211,235.82 to which the ten percent interest rate is attached. Thereafter, the judgment orders Randolph to reimburse Reliance in the amount of $59,196.55 and is silent as to interest. We find it implicit in the judgment that the proportionate interest earned on the sum owed to Reliance should be paid to Reliance and not retained by Randolph. Thus there is no "double recovery" for Randolph. See Webster v. M/V Moolchand, Sethia Liners, Ltd., 730 F.2d 1035, 1041 (5th Cir.1984); Howell v. Marmpegaso Compania Naviera, 578 F.2d 86, 87 (5th Cir.1978).
 
 Severance
 
 20
 The Randolphs' action against Laeisz had been in discovery for more than three years and was set for trial April 14, 1988 when Laeisz joined ITO as a third party defendant on January 8, 1988. Fed.R.Civ.P. 42 provides that the court, in furtherance of convenience or to avoid prejudice, may order a separate trial. It appears beyond dispute that the trial court did not abuse his discretion in granting the severance because the third party defendants would have been unable to independently complete discovery in the few weeks remaining before trial. United States v. 499.472 Acres of Land More or Less in Brazoria, 701 F.2d 545, 549-50 (5th Cir.1983).
 
 Summary Judgment
 
 21
 Summary judgment is appropriate under Fed.R.Civ.P. 56 if the record discloses "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In reviewing the summary judgment, we apply the same standard of review as did the district court. Waltman v. International Paper Co., 875 F.2d 468, 474 (5th Cir.1989); Moore v. Mississippi Valley State University, 871 F.2d 545, 548 (5th Cir.1989). The pleadings, depositions, admissions, and answers to interrogatories, together with affidavits, must demonstrate that no genuine issue of material fact remains. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To that end, we must "review the facts drawing all inferences most favorable to the party opposing the motion." Reid v. State Farm Mut. Auto. Ins. Co., 784 F.2d 577, 578 (5th Cir.1986). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).
 
 
 22
 After the jury rendered its verdict against Laeisz in the severed action, the trial court granted ITO's motion for summary judgment against Laeisz. Both parties submitted to the court as evidence for summary judgment purposes excerpts from certain depositions and testimony given at trial on the main demand. Notably, the parties did not submit these materials to the court for a judgment on the merits.
 
 
 23
 In granting ITO's motion for summary judgment, the district court held that the vessel owner "has a duty to intervene for repairs or warnings when the shipowner is aware of the defect, should have known that it presented an unreasonable risk of harm, and recognizes that the stevedore would not remedy the situation ... The link of causation between the stevedore's negligence [in damaging the gangway] and [Randolph's] injury is broken by the intervening failure of the ship to take the damaged gangway out of service." The district court further held that because "the stevedore was not in control of the gangway and had no operational responsibility for it, the stevedore fulfilled its duty toward [Randolph] by informing the ship of the damaged gangway ... The ship had the responsibility of providing a safe gangway, and the ship's failure to remove the gangway is the sole cause of [Randolph's] injury." We find that the grant of summary judgment in favor of the stevedore was inappropriate.
 
 
 24
 Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981) delineates the respective duties owed to a longshoreman by the vessel owner and the stevedore. Woods v. Sammisa Co., Ltd., 873 F.2d 842, 847 n. 6 (5th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 853, 107 L.Ed.2d 847 (1990). Two general tenets underlie the distribution of these duties: first, as a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards; second, the vessel owes to the stevedore and his longshoremen employees the duty of exercising due care under the circumstances. Scindia, 451 U.S. at 169-70, 175, 101 S.Ct. at 1623, 1626. The basic principle which emerges from Scindia is that the primary responsibility for the safety of the longshoremen rests upon the stevedore. Masinter v. Tenneco Oil Company, 867 F.2d 892, 896 (5th Cir.1989); Wild v. Lykes Bros. S.S. Corp., 734 F.2d 1124, 1126 (5th Cir.1984); Helaire v. Mobil Oil Co., 709 F.2d 1031, 1036 (5th Cir.1983).
 
 
 25
 The Masinter court noted that Scindia's broad statement of vessel immunity is tempered by three exceptions:
 
 
 26
 1) if the vessel owner fails to warn on turning over the ship of hidden defects of which he should have known.
 
 
 27
 2) for injury caused by hazards under the control of the ship.
 
 
 28
 3) if the vessel owner fails to intervene in the stevedore's operations when he has actual knowledge both of the hazard and that the stevedore, in the exercise of "obviously improvident" judgment, means to work on in the face of it and therefore cannot be relied on to remedy it.
 
 
 29
 Masinter, 867 F.2d at 897. See Scindia, 451 U.S. at 167, 175, 101 S.Ct. at 1622, 1624; Treadway v. Societe Anonyme Louis-Dreyfus, 894 F.2d 161, 165 (5th Cir.1990); Turner v. Costa Line Cargo Services, Inc., 744 F.2d 505, 512 (5th Cir.1984).
 
 
 30
 With a few exceptions, the facts recited at the outset of this opinion were before the court on summary judgment. However, Laeisz disputed ITO's allegation that the vessel placed its gangway across the fixed crane track or that the stevedore advised the vessel's personnel not to place the gangway across the track. It is not disputed that after the crane operated by an ITO employee ran into and damaged the gangway, Stevedore Superintendent Rigdon and Third Mate Ramming determined that the gangway did not create an unreasonably dangerous condition. Rigdon, ITO's employee, acknowledged that one of his primary concerns as a superintendent was the safety of the people working under his control (including Randolph). If he had determined that the gangway presented an unsafe condition, it was his responsibility to correct it, to see that it was corrected, or, if necessary, to shut the job down.
 
 
 31
 The trial court held that the vessel was negligent in failing to take the gangway out of service. However, it is a fundamental principle of tort law that one cannot be liable for negligence unless one first has a duty to act. Kerr-McGee Corp. v. Ma-Ju Marine Services, Inc., 830 F.2d 1332, 1340 (5th Cir.1987); Futo v. Lykes Brothers, S.S. Co., Inc., 742 F.2d 209, 214 (5th Cir.1984). Under Scindia the vessel only had a duty to intervene if 1) it had actual knowledge that the damaged gangway posed an unreasonable risk of harm and 2) actual knowledge that it could not rely on the stevedore to protect its employees and that if unremedied the condition posed a substantial risk of injury. Woods v. Sammisa Co., Ltd., 873 F.2d 842, 847 (5th Cir.1989); Lormand v. Superior Oil Co., 845 F.2d 536, 542 (5th Cir.1987), cert. denied, 484 U.S. 1031, 108 S.Ct. 739, 98 L.Ed.2d 774 (1988); Wild v. Lykes Bros. S.S. Corp., 734 F.2d 1124, 1126-27 (5th Cir.1984); Helaire v. Mobil Oil Co., 709 F.2d 1031, 1038-39 (5th Cir.1983). The trial court utilized an incorrect standard when it determined that the vessel "knew or should have known" that the condition presented an unreasonable risk of harm.
 
 
 32
 There is a distinction between knowledge of a condition and knowledge of the dangerousness of that condition. In Woods v. Sammisa Co., Ltd., 873 F.2d 842, 853 (5th Cir.1989), we held that it was improper for the jury to be instructed on the third Scindia exception because although there was ample evidence that the defendants were aware of the overlapping condition of the cargo, there was no evidence that the defendants were actually aware that an unreasonable risk of harm was thereby created. The fact that officers of the vessel knew that the pipe would have to be discharged slowly because of the overlap fell "well short of putting the vessel interests on notice that the overlap created an unreasonable risk of harm to the longshoremen." Id.
 
 
 33
 Furthermore, actual knowledge of a dangerous condition does not in and of itself render the vessel's failure to act negligent. This Court has noted that in some situations the vessel owner is entitled to rely on the stevedore's judgment that the condition, though dangerous, was safe enough. Helaire, 709 F.2d at 1039 n. 12. See Scindia, 451 U.S. at 175-76, 101 S.Ct. at 1626. It is only where the stevedore's judgment in continuing to work in the face of danger is "obviously improvident" that the vessel acquires a duty to intervene. Scindia, 451 U.S. at 175-76, 101 S.Ct. at 1626; Woods, 873 F.2d at 855.
 
 
 34
 Disputed questions of fact exist regarding whether in fact the slightly damaged gangway created an unreasonable risk of harm and if the stevedore's decision to continue to use the gangway was so "obviously improvident" as to trigger the vessel's duty to intervene. Given that both the stevedore and the vessel inspected the four inch gash in the end of the gangway and determined that it was safe for continued use, a material dispute exists as to whether the stevedore's actions were "obviously improvident." See Gill v. Hango Ship-Owners/AB, 682 F.2d 1070, 1075 (4th Cir.1982) (whether the vessel owner should have intervened because the stevedore's behavior was "obviously improvident" is a question of fact for the jury). Generally, the question of negligence in a maritime case is a question of fact for the jury. Masinter, 867 F.2d at 898; Lormand, 845 F.2d at 543 n. 9.
 
 
 35
 For the foregoing reasons, the damages award is REVERSED and REMANDED for a new trial in accordance with this opinion, and the grant of summary judgment is REVERSED.